IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOSE F. OLIVARES                          JURY DEMAND
  Plaintiff

vs.                                       Case No. 22-CV-10574

                                          Before the Honorable

PERFORMANCE CONTRACTING
GROUP                                     Magistrate
CHARLES WILLIAMS                          Grand
  Defendants
_____
       MOTION AND BRIEF FOR SUMMARY JUDGEMENT
       AND REBUTTAL TO DEFENDANT'S MOTION
              FOR SUMMARY JUDGEMENT
_____

Now comes Jose F. Olivares and says;

GROUNDS

  In rebuttal Jose F. Olivares says

1.  Defendant's present conclusionary statements as to an injunction obtained in

Kosciusko County in 1999. To which was then declared a final order by the Court

of Appeals after the Honorable David Shwartz issued his order by Exhibit B ECF

46 Pg ID 308-310. This was over ruled by the Court of Appeals in 2005, finding

that PCG had obtained it's adequate remedy in law in 1999. The Court of Appeals

in affirming the lower Court clearly stated final relief had been obtained by

Defendants. Attached herein. Exhibit D.

1

2.  Defendant's have had more than ample opportunity through these 22 years to demonstrate an act of terrorism, or harassment. These are clearly conclusionary statements without a scintilla of fact.

3. Clearly Defendants did not file a Counter Claim as to the facts alleged by Plaintiff. Defendants admitted to Defendants claim by failure to deny by Federal Rules of Civil Procedure 8(6).

4. Clearly Defendant's Exhibit C is without factual basis. Plaintiff filed a malpractice action against William's IME Surgeon in 2021. However, the Court of Appeals determined that the action was time barred. Limitations. ECF 46 PgID 24-34.

5. Defendant's motion for summary judgement is in direct violation of Federal Rules of Civil Procedure 56. ECF 46 PgID 301-302. This is an affidavit. Plaintiff is clearly entitled to cross examination.  The simple fact is Plaintiff had more than one communication with Charles Williams. There were in total over 50 conversations, and Mr. Williams from Lenexa Ks., first admitted that he authorized said surgery. To which PCG pierced their Corporate veil. By definition **IC 16-18-2-163.4"Health care representative"**

Sec. 163.4. (a) "Health care representative", for purposes of IC 16-21-12, has the meaning set forth in IC 16-21-12-4.
    (b) "Health care representative", for purposes of IC 16-36-7, has the meaning set forth in IC 16-36-7-13.
*As added by P.L.137-2015, SEC.4. Amended by P.L.50-2021, SEC.18.*

**IC 16-36-7-13"Health care representative"**

2

Sec. 13. As used in this chapter, "health care representative" means a competent adult designated by a declarant in an advance directive to:

(1) make health care decisions; and

(2) receive health information;

regarding the declarant. The term includes a person who receives and holds validly delegated authority from a designated health care representative.

*As added by P.L.50-2021, SEC.63*

.

6. As to Exhibit 4 stated by Defense Counsel ECF 46 PgID 323 clearly states

Plaintiff was seeking superintending control over the MCAC, which was denied.

ECF 46 PgID 298.

7. Defendants rest their case on an amendment as to the reason Williams

committed an intentional tort, ECF 46 PgID 296.

8. Defendant's have submitted numerous actions to which they were required to

file the underlying complaint and failed to do so. ECF 46 PgID 297.

FEDERAL RULES OF CIVIL PROCEDURE 56(a).

 Defendants have failed to state Plaintiff's claim or their defense by their motion.

Basically Defendants are asserting that Plaintiff did not personally see Charles

Williams telephone his IME Surgeon. To that Plaintiff merely responds, that he did

speak with Charles Williams as to what he authorized in surgery and to his IME as

to what he saw in surgery, to conclude that Charles Williams violated MCL

418.131.

 As an ongoing injury to which Charles Williams is willfully disregarding is

Plaintiff could not receive re instatement of wage loss benefits, in 2005, because

3

Williams had intercepted Plaintiff's surgical video and bone and ligament, in 1998. Williams clearly testified as privileged Plaintiff's medical condition in 1999. To which the Doctrine of Res Judicata was ignored by the Magistrate in 2005. As an MCL 418.222 violation the Employer then admitted that Plaintiff had proved he suffered a rotator cuff tear in 2000. Exhibit F., when in fact he had not. The Magistrate then proceeded to set the bar as to Plaintiff being able to compete with an able bodied worker, to which Plaintiff could not demonstrate that he could not meet, because Williams willfully disregarded the fact that Plaintiff proved his injury arising out of and in the course of employment and should have provided Plaintiff's medical condition to the Magistrate and MCAC to then open award as of May 5th 1998 and simply did not.

 By R 56(a) in motion it is stated that Plaintiff cannot demonstrate that Defendant Charles Williams with PCG intended to injure Plaintiff by authorizing surgery and acromioplasty. ECF 46 PgID 296.

  Plaintiff states by his statement of facts ECF 23 PgID 83 under Claim 1 that Charles Williams had authorized said surgery. That is intentional. By Williams own affidavit ECF 46 PgID 302 paragraph 2, admits Williams was handling a worker's compensation claim. Paragraph 3. Due to threatening and harassing communication from Mr. Olivares….. paragraph 5. Olivares states I intentionally injured him. Paragraph 6. This allegation, is entirely false….

4

That in and of itself means that Charles Williams former Counsel with PCG is denying that he intended to injure Plaintiff. That is a question of fact, precluding summary judgement.

The second part is the willful disregarded that knowledge.

1. Plaintiff by attachment now demonstrates Performance Abatement Services was the named Employer in 2000 hearing. Exhibit F. attached herein.

2. PCG did not appear and testify as to their offer of work. ECF 37 PgID 195

The PCG letter should have been testified to which demonstrates willful disregard of that knowledge.

3. Williams and PCG given over 22 years to state to the Michigan Worker's Disability Compensation Agency as to Plaintiff's permanent medical condition willfully disregarded the knowledge that Plaintiff is now with a permanent impairment and ongoing injury resulting in disability, due to Williams decision to disobey statute in representing a non employer and then afterwards providing a letter admitting they were aware of the injury and would offer temporary employments.

After Williams pierced PCG's corporate veil in authorizing 1998 w surgery without Plaintiff's knowledge or consent, ECF 23 PgID 83 Claim 1. In violation of Ind. Code **IC 16-36-7-13,** as not an authorized representative, in any manner, shape or form. Clearly not informing the Michigan Worker's Disability

Compensation Agency after Plaintiff proved his injury, in 2000,as to Plaintiff's

ongoing injury because Williams wanted to contest the injury, demonstrates that

Williams then further intentionally injured Plaintiff by withholding a surgical

video as well as bone and ligament authorized by Plaintiff for payment.. Because

in Williams and PCG's mind, Plaintiff first had to prove an injury arising out of

and in the course of employments. Neither Williams nor PCG informed Plaintiff

prior to intentionally interfering with surgery, knowing that their IME surgeon had

not performed sufficient medical testing to determine whether an acromioplasty

was otherwise medically warranted. With Williams knowing full well that Plaintiff

who knew he had a "narrowing of the subacromial space," was not about to

authorize an open repair without further medical testing. Williams and PCG

wanted to contest Plaintiff's injury, and did not authorize a repair. Williams

wanted to show that Plaintiff with an aggravation removed, which means that

Williams thought Plaintiff was stupid enough to depose his IME doc, who would

state a fortuitous event could then Williams and PCG could then walk away. By

Plaintiff's statement of facts Williams corrupted a surgeon to which Plaintiff had

planned to depose, with a trip with Plaintiff's AIG nurse to Hawaii. After Plaintiff

was informed by said IME that a surgical video was not available, Plaintiff knew

that Williams intentionally wanted to injury Plaintiff. But Plaintiff did not know

that Williams did so in the hopes that rehabilitation would restore functionality to

6

Plaintiff's left shoulder.

  As a result of Williams intentional tort Plaintiff was not able to show a diagnosis based upon ECF 37 PgID 200 "tender over the coracoid."

### PLAINTIFF'S MOTION FOR SUMMARY JUDGEMENT

1.  Defendant's have failed to demonstrate that there is no genuine issue of material fact in this action. Defendant has not even plead a defense. Federal Rules of Civil Procedure 56(c).

2.  By Plaintiff's amended complaint Defendant's were informed that Plaintiff had obtained newly discovered evidence that could not be obtained previously. To which Defendant's clearly demonstrated they sought an injunction to preclude Plaintiff from obtaining medical evidence in 1999. ECF 46 PgID 303 paragraph 3.
 As a matter of law, Defendant's did not have to divulge what their IME surgeon saw in surgery, in 1998. Plaintiff was still required to prove his injury arising out of and in the course of employment.

3. Defendants simply have not denied any of Plaintiff's well plead facts except for the fact that Plaintiff as legal theory proposed a reason that Williams authorized a surgery that he knew would injure Plaintiff. An acromioplasty was not authorized by Plaintiff. It was authorized by Charles Williams. An acromioplasty is part of a rotator cuff repair. At no time previously did Plaintiff have personal knowledge, except by 2021 Ultrasound that corresponds to the 1998 MRI, revealing a

supraspinatus tear ECF 37 PgID 210.   .

The first prong of the intentional tort doctrine is that Williams intended the injury.

Clearly given ample opportunity, Williams has not demonstrated that Plaintiff

authorized an acromioplasty. The removal of bone and ligament. Or that Plaintiff

gave PCG and Williams authority to dictate surgery, as Plaintiff's representative.

  Now Williams did so as the surgical report from Williams IME Surgeon clearly

states ECF 37 PgID 203-204so that the Surgeon could get a good look. Now

Plaintiff did not have the second half of the coin as to an intentional tort until 2021.

Plaintiff authorized an arthroscopic procedure. First and foremost because

inadequate medical testing had been performed. ECF 37 PgID 202 Plaintiff did not

know either before or after surgery whether the tear could be repaired. But an

acromioplasty, was performed decompressing the shoulder. There simply is no

other reason for an open repair and acromioplasty other than to get a good look.

  After the ECF 37 PgID 210 Ultrasound, Plaintiff can clearly allege that Williams

was going to contest the injury and just told his IME Surgeon not to repair the tear.

  In 1999, Williams then stated several things ECF          .

 1. That he was on top of this from day 1. Clearly Defendant's have not denied this

as fact.

2. Williams authorized the surgery, from Lenexa Ks to his IME Surgeon in Indiana

in 1998. By communication previous to Williams obtaining injunction and his full

relief in 1999 Plaintiff did communicate with Williams. Williams admitted by said communication that the Surgeon performing the surgery was his employee. Williams asserted privilege in 1999 when asked as to what his IME Surgeon saw.

Williams did not have to stater what the injury was and should not have stated anything to the surgeon in the first place as not Plaintiff's representative. As a criminal act to which has civil damages, Williams interfered with a trial as to Plaintiff's injury. The Court may take judicial notice that at no time did the Magistrate determine in 2000 that Plaintiff had a rotator cuff repair. Exhibit F attached. In 2021, Plaintiff then knew that Williams had in fact committed an intentional tort, by authorizing his IME Surgeon to perform an acromioplasty and then not perform a rotator cuff repair.

And Defense Counsel has the transcript testimony as to the preliminary injunction obtained in 1999, to which Williams testifies as follows;

1. He was on top of this from day 1. ECF 23 PgID 86 paragraph 3.

2. He authorized surgery. ECF 23 PgID 83

3. Williams was asserting privilege, as to what his IME Surgeon saw in 1998. ECF 23 PgID 86 Paragraph 5.

4. Williams has not submitted an affidavit demonstrating that he was authorized to act as Plaintiff's representative. To which by MCL 750.122, then precluded Plaintiff from deposing the surgeon as Williams IME.

9

Plaintiff's pleadings were not templated. But it is certainly clear that Williams had actual knowledge that he was not authorizing a repair, and that by not authorizing a repair Plaintiff would suffer a permanent impairment. This is 100% certain to occur.

As stated neither Williams nor PCG have shown they were Plaintiff's authorized Representatives, and have not shown they could authorize or pay for surgery in the first place.

As mens rea

**750.122 Prohibited acts; witnesses; threat or intimidation; affirmative defense; violation as felony; penalties; applicability of section; definitions.**

Sec. 122.

(1) A person shall not give, offer to give, or promise anything of value to an individual for any of the following purposes:
(a) To discourage any individual from attending a present or future official proceeding as a witness, testifying at a present or future official proceeding, or giving information at a present or future official proceeding.
(b) To influence any individual's testimony at a present or future official proceeding.
(c) To encourage any individual to avoid legal process, to withhold testimony, or to testify falsely in a present or future official proceeding.
(2) Subsection (1) does not apply to the reimbursement or payment of reasonable costs for any witness to provide a statement to testify truthfully or provide truthful information in an official proceeding as provided for under section 16 of the uniform condemnation procedures act, 1980 PA 87, MCL 213.66, or section 2164 of the revised judicature act of 1961, 1961 PA 236, MCL 600.2164, or court rule.
(3) A person shall not do any of the following by threat or intimidation:
**(a) Discourage or attempt to discourage any individual from attending a present or future official proceeding as a witness, testifying at a present or future official proceeding, or giving information at a present or future official proceeding.**

10

**(b) Influence or attempt to influence testimony at a present or future official proceeding.**

(c) Encourage or attempt to encourage any individual to avoid legal process, to withhold testimony, or to testify falsely in a present or future official proceeding.

(4) It is an affirmative defense under subsections (1) and (3), for which the defendant has the burden of proof by a preponderance of the evidence, that the conduct consisted solely of lawful conduct and that the defendant's sole intention was to encourage, induce, or cause the other person to testify or provide evidence truthfully.

(5) Subsections (1) and (3) do not apply to any of the following:

(a) The lawful conduct of an attorney in the performance of his or her duties, such as advising a client.

(b) The lawful conduct or communications of a person as permitted by statute or other lawful privilege.

(6) A person shall not willfully impede, interfere with, prevent, or obstruct or attempt to willfully impede, interfere with, prevent, or obstruct the ability of a witness to attend, testify, or provide information in or for a present or future official proceeding.

(7) A person who violates this section is guilty of a crime as follows:

(a) Except as provided in subdivisions (b) and (c), the person is guilty of a felony punishable by imprisonment for not more than 4 years or a fine of not more than $5,000.00, or both.

(b) If the violation is committed in a criminal case for which the maximum term of imprisonment for the violation is more than 10 years, or the violation is punishable by imprisonment for life or any term of years, the person is guilty of a felony punishable by imprisonment for not more than 10 years or a fine of not more than $20,000.00, or both.

(c) If the violation involves committing or attempting to commit a crime or a threat to kill or injure any person or to cause property damage, the person is guilty of a felony punishable by imprisonment for not more than 15 years or a fine of not more than $25,000.00, or both.

(8) A person who retaliates, attempts to retaliate, or threatens to retaliate against another person for having been a witness in an official proceeding is guilty of a felony punishable by imprisonment for not more than 10 years or a fine of not more than $20,000.00, or both. As used in this subsection, "retaliate" means to do any of the following:

(a) Commit or attempt to commit a crime against any person.

(b) Threaten to kill or injure any person or threaten to cause property damage.

(9) This section applies regardless of whether an official proceeding actually takes place or is pending or whether the individual has been subpoenaed or

11

otherwise ordered to appear at the official proceeding if the person knows or has reason to know the other person could be a witness at any official proceeding.

 (10) This section does not prohibit a person from being charged with, convicted of, or punished for any other violation of law arising out of the same transaction as the violation of this section.

 (11) The court may order a term of imprisonment imposed for violating this section to be served consecutively to a term of imprisonment imposed for the commission of any other crime including any other violation of law arising out of the same transaction as the violation of this section.

 (12) As used in this section:

 **(a) "Official proceeding" means a proceeding heard before a legislative, judicial, administrative, or other governmental agency or official authorized to hear evidence under oath, including a referee, prosecuting attorney, hearing examiner, commissioner, notary, or other person taking testimony or deposition in that proceeding.**

 (b) "Threaten or intimidate" does not mean a communication regarding the otherwise lawful access to courts or other branches of government, such as the otherwise lawful filing of any civil action or police report of which the purpose is not to harass the other person in violation of section 2907 of the revised judicature act of 1961, 1961 PA 236, MCL 600.2907.

FEDERAL RULES OF CIVIL PROCEDURE 8(6).

Clearly Defendant Williams and Defendant PCG failed to deny the amended complaint, which supersedes the complaint. PCG did not deny any allegations whatsoever in amended complaint, and are otherwise deemed admitted. Federal Rules of Civil Procedure 8(6).

 By operation of law Defendants did not preserve any defenses in failing to answer Plaintiff's amended complaint filed.

FEDERAL RULES OF CIVIL PROCEDURE 12(f)

 Defendants pleadings are conclusionary and not evidentiary. Defendant's perceptions that Plaintiff's  inquiry of work to which PCG issued letter ECF 37

PgID 195 as harassing, overlooks the fact that PCG pierced their Corporate veil to become Plaintiff's employer. Providing a return to work letter in and of itself does not authorize PCG to then authorize an acromioplasty and not authorize a repair. Plaintiff concedes that PCG as Employer can contest the injury. What PCG cannot do is override Plaintiff's demand for arthoscopic repair.

   As a fraud on the Court, Defendants omit the Court of Appeals decision affirming  the granting of full faith and credit in stating that PCG got their full relief in 1999 in obtaining a preliminary injunction. Exhibit D attached. Defendant's attached the 2003 order and not the 1999 preliminary injunction to which was actually affirmed by the Court of Appeals in 2005. Exhibit D. FEDERAL RULE 12(h)(3).

  Defendants clearly are relying on past filings in various Courts as to various torts that Plaintiff was aware of and were summarily dismissed as being one for the Michigan Worker's Disability Compensation Agency. Basically the dismissals were a lack of subject matter jurisdiction. And any adjudication based upon a lack of subject matter jurisdiction is not a judgement in fact. The dismissals based upon a lack of subject matter jurisdiction is not one on the merits. Hence the merits were not decided. In 2000 the merits were decided as placing Plaintiff under MCL 418.301(5), to which Defendants have never provided 250 weeks of work, nor wage loss benefits. *McJunkin v Cellastro Plastics Co*. 461 Mich. 590; 608 N.W.2d

**57** (**2000**)

 Plaintiff clearly has a claim under MCL 418.131 as Defendants knew an injury was to occur because they were not going to provide favored work whatsoever, and by their actions have not allowed Plaintiff to either receive wage loss benefits nor medical for his ongoing injury resulting in disability as of May 5th 1998. Williams willfully withheld Plaintiff's medical condition from the Worker's Compensation Agency as of 2000. To which Plaintiff was unable to obtain a re instatement based upon said willful disregard for the consequences.

ECF 23 PgID 85-93

I, Jose F. Olivares, verify and affirm that all the statements contained herein are true and correct, based upon information, personal knowledge and belief, and if called as a witness would testify competently to the following;

 Preliminarily Plaintiff states that at no time did Plaintiff prove he suffered a rotator cuff tear as the result of the May 5th 1998 injury. The Magistrate in 2000 did not find or order that Plaintiff suffered a tear or had a tear repaired.

1. I, Jose F. Olivares, am the Plaintiff.

2. Performance Contracting Group, Charles Williams are the Defendants.

Complete diversity exist as Plaintiff, resides in MI, and Performance Contracting Group as well as their umbrella of corporate entities no longer do business in MI.

The amount in controversy exceeds $75,000.00 4 Case 2:22-cv-10574-MFL-DRG

14

ECF No. 23, PageID.85 Filed 05/10/22 Page . Charles Williams with Performance Contracting Group testified in 1999 before the Kosciusko Circuit Court, that he was aware of Plaintiff's injury and had been on top of this from day 1.

 4. Charles Williams further testified that he accepted liability for the actions of his surgeon, as to the events of June 22nd 1998 surgery.

 5. When questioned as to what the Surgeon's diagnosis was, Charle's Williams then asserted privilege.

6. Plaintiff did not receive the June 22nd 1998 surgical video, nor the bone and ligament removed by surgery, as of June 22nd 1998. Performance Contracting Group paid for said surgery and rewarded said Surgeon with a trip to Hawaii, with their Nurse Mary Ann Schaffer.

7. Plaintiff proved his injury arising out of and in the course of employment in 2000, by testimony to which medical evidence supported, and was placed under a suspension of benefits, to perform 250 weeks of reasonable employments.

8. The Employer did not testify as to their offer of work, being made the subject of dispute, and Plaintiff testified that he was not offered work, even though attending the Lansing job site in order for said offer of work to be made. And Plaintiff learned later that Performance Abatement Services had been removed from the Lansing job site prior to said offer of work being made by Performance Contracting Group.

15

9. Plaintiff was provided further order that "he shall receive reasonable and necessary medical care for his injury, in 2000. Award was closed as to surgical event. 10. In 2004, Plaintiff applied for a re instatement of wage loss benefits, to which the unnamed Commissioners then opined that the Employer had the right to medical exam. Presumably for the appropriateness of any further offers of work.

11. In 2005, Christopher Ambrose, then re litigates the 1998 surgical report to which L'Mell Smith had not found or ordered as a rotator cuff repair, in again resolving the surgical report, in closing award, and then opining, illegally that Plaintiff suffers a natural medical condition of life, not diagnosed or opined by any competent physician at any time as a degenerative shoulder. Plaintiff had previously answered the Magistrate's question in 2000, as to arthritis, in the negative.

12. The unnamed Commissions then affirm the 2005 order as appropriate. To which by law, it is otherwise ministerial to re instate benefits until the Employer shows that Plaintiff has performed 250 weeks of work. MCL 418.301(5)..

13. In 2021, upon a routine medical visit with the V.A. physician, said physician then orders an ultrasound, as to Plaintiff's left shoulder.

14. Upon examination Plaintiff then discovers that the three sutures placed in healthy tendon in 1998 has resulted in a rotator cuff tear.

15. Charles Williams in 1998 wrongfully concealed his action of telling the

Surgeon to perform an acromioplasty and place three sutures in a normal tendon to then result in a rotator cuff tear. To which Christopher Ambrose wrongfully aids in this concealment by not allowing for further medical testing in 2005, stated with particularity.

16. Stated with particularity Plaintiff was not provided the surgical video, nor the bone and ligament removed by June 22nd 1998 surgical date. Plaintiff had no other method of discovering the result of Charles Williams authorization of surgery to remove bone and ligament and place three sutures in healthy tendon. And Plaintiff is not in the same position as a Magistrate, who by law is an investigator and has specialized knowledge and would know the result of placing sutures in healthy tendon.

17. At all material times Plaintiff has acted with due diligence, to determine what the actual result of surgery was on June 22nd 1998, but the 2000 order did not have a monetary amount so that Plaintiff could have testing performed by going to Circuit Court. Clearly Plaintiff could not determine the results of surgery authorized by Charles Williams, and actively concealed by Christopher Ambrose, as well as the unnamed Commissioners. They have the specialized knowledge by Statute to know the results of the 1998 surgical report tendered as of 1998 and not Plaintiff. Plaintiff can show over 15 years of going to the V.A. Hospital as to this medical condition of not being able to move his left shoulder up very well after

surgery as conclusively found by L'Mell Smith by 2000 order.

18. The first question L'Mell Smith asked Plaintiff at 2000 hearing was "how did it feel?" No one else had asked that question. Immediately Plaintiff stated "like a vise." The Magistrate knew at that moment that Plaintiff had not suffered a rotator cuff tear on May 5th 1998. And that the 1998 surgery authorized by Charles Williams resulted in a rotator cuff tear to which Plaintiff was not aware.

19. Performance Contracting Group is the parent corporation of Performance Abatement Services and admitted before the Michigan Supreme Court in 2001, that they are one and the same entity.

20. In 2000, Counsel for Performance Abatement Services stipulated as to an Employer, Employee relationship between PAS, and Plaintiff, before the Honorable L'Mell Smith at a worker's compensation hearing.

21. Plaintiff clearly asked Williams in 1999 before the Kosciusko Circuit Court, "What is that diagnosis?" To which as CONCEALMENT, Williams responded as privileged.

22. By 2000 order the Magistrate orders Plaintiff "STILL DISABLED," without medical testing. The reason she does so, is based upon the IME physicians opining that "he can't move that arm up very well."

23. Plaintiff is now owed in back wages absent Union benefits of $2.00 per hour, over $8 million in lost wages as of May 5th 1998, being $15.65 over a 40 hour

week, with penalties and interest per annum of 12%, as actual damages, as to this date. 24. PCG through Charles Williams knew or should have known the above stated facts, as well as that Plaintiff has not had his ruptured disk surgically treated, and has had an acromiplasty authorized by PCG, through Charles Williams as of 1998, and discovered, through due diligence an additional cause for pain, as a rotator cuff in 2021, due to the wrongful action of Charles Williams in not providing surgical video, and then asserting in 2005 without medical evidence that Plaintiff has suffered a rotator cuff tear, and had been repaired in surgery to which there are three sutures in an otherwise normal tendon.

25. Stated with particularity, Charles Williams called Dr. Graber, on or around June 22nd 1998 advising as to surgery from his office in Lenexa Ks. Williams and advised Graber, in Goshen Indiana, at his office, not to perform a repair. But instead place three sutures in a healthy tendon and represent that it was a rotator cuff tear repaired, to Plaintiff's detriment injury and aggrievement. Williams did so because he receives a bonus when an injured worker does not receive compensation. Basically Williams wanted to show that Plaintiff could return to normal work when an acromioplasty removed bone and ligament, removing aggravation to the tendon and muscle, as a fortuitous event, and not compensable. Williams knew that Plaintiff left shoulder locked up after falling on May 5th 1998, because the articular disk in the AC joint had ruptured, while Plaintiff fell to his

back with his left shoulder raised. The humeral head, hit the glenoid which transmitted the force required to then rupture the articular disk. 26. The 2021 Ultrasound is found in Case No. 21-cv-12079, and is not in Plaintiff's possession, revealing a rotator cuff tear, admitted by PCG in 2005, to which the surgical report only shows three sutures in a healthy tendon, absent the surgical video.

IN AMENDMENT PLAINTIFF STATES AS FOLLOWS

27, Charles Williams was on top of this action as of May 5th 1998, as testified before the Honorable Rex Reed, in Kosciusko County Indiana.

28. Charles Williams was aware that X rays taken on May 5th 1998 15 minutes after injury were normal.

29. Charles Williams knew on June 6th 1998 that the MRI revealed "narrowing of the subacromial space," to which X rays cannot see, a ruptured disk in the AC joint or a Rotator Cuff tear. 30 Charles Williams authorized emergency surgery as to a acromioplasty, as to his surgeon's suggestion, based upon a "narrowing of the subacromial space," which only have two causes, being the bursa, and acromion, as found by MRI in 1998, and not seen on X ray on May 5th 1998. To which Charles Williams knew there was no medical testing as to pathology. But knew decompression requires both an acromioplasty as well as a resectioning of bursa, to address the injury arising out of and in the course of employment, on May 5th 1998 and elected an acromioplasty only knowing that Plaintiff would have an

ongoing injury afterwards.

31. Plaintiff did not receive bone and ligament because they were normal, and did not receive surgical video after demand was made in 1998, as to Charles Williams and his Surgeon. Plaintiff was unaware as to the requirements of a decompression until earlier this week, as without testing being an acromioplasty as well as bursa resection.

31. Charles Wililams knew that Plaintiff had stated he fell to his back while performing over head work, to which the bursa then narrowed the subacromial space.

32. Charles Williams authorized the acromioplasty, in 1998 in communication with his Surgeon from his office in Lenexa Ks, to Goshen Hospital, in Goshen Indiana, without Plaintiff's knowledge or consent, in 1998 and failed to authorize a resectioning of the bursa, which was required, for decompression, as no testing had been performed differentiating the cause for narrowing of the subacromial space.

33. Charles Williams was informed by his Surgeon as to the required authorization for decompression being resecting both the Bursa as well as Acromion, to which Plaintiff had not authorized resection of Acromion, and implicitly authorized resection of bursa, as a rotator cuff repair.

34. Charles Williams had actual knowledge as of June 22nd 1998, that Plaintiff's left shoulder was impinging due to the bursa swelling, and that no medical testing

had been performed as to the acromion causing impingement, and knew that authorizing an acromioplasty would worsen Plaintiff's impingement as the result of the bursa swelling, and disregarded that knowledge, resulting in a worsening medical condition, and ongoing injury as a result. 35. No medical testing was performed as to a tendon tear, prior to June 22nd 1998 Surgery.

36. Plaintiff received notice by letter that Counsel for Performance Contracting Group, Charles Williams would raise a Federal Rule of Civil Procedure 12(B), defense as failure to state a claim and there was no intentional tort, as well is on notice that an affirmative response has been filed as of May 5th 2022, on May 10th 2022.

EXHIBITS FILED

ECF 37 PgID 195 PCG letter admitting injury and offer of temporary work. Employer letter to Employee

ECF 37 PgID 200 Emergency room report "tender over the coracoid." No diagnosis. Withheld after surgery. Adversely affecting open award. No medical care provided. Willful disregard as to authorizing surgery. Probably the coracohumeral ligament by anatomy.

ECF 37 PgID 202 extend of shoulder examination. Insufficient for Plaintiff to authorize acromioplasty. Willful disregard by Williams. Injury certain to occur.

ECF 37 PgID 203-204 Acromioplasty, debridement 3 sutures placed in shoulder.

Tear not repaired Subdeltoid bursa over supraspinatus not resectred.. Williams knew an injury was to occur because he was contesting the rotator cuff tear. Willful disregard that Plaintiff would be impaired afterwards.

ECF 37 PgID 208 1998 MRI "mild degenerative changes in the AC joint," not diagnosed. Diagnosed in 2005 as internal derangement. Rupture of articular disk. Not medically addressed. Impression of complete supraspinatus tear. Williams does not provide reasonable medical care. Willful disregard.

ECF 37 PgID 210 V.A. Ultrasound. NEW EVIDENCE THAT COULD NOT BE OBTAINED PREVIOUSLY WITH DUE DILIGENCE BECAUSE DOCTORS DISCRETION IN UTILIZING MEDICAL RESOUCES. Williams will not comply with 2000 order requiring said medical care. Certain that tendon would retract and fatty infiltration along with impingement. Willful disregard.

ECF 44 PgID 284 V.A. Letter making probable that Plaintiff has the same tear as after surgery in 1998.

LAW AS TO SUMMARY JUDGEMENT

II. STANDARD OF REVIEW We review a district court's grant of summary judgment de novo. *Watson v. Cartee*, 817 F.3d 299, 302 (6th Cir. 2016). Summary judgment is appropriate only if there is "no genuine issue as to any material fact" and the moving party is entitled to judgment as a matter of law. *Richmond v. Huq,* 885 F.3d 928, 937 (6th Cir. 2018) (quoting Fed. R. Civ. P. 56(a)). "A genuine issue

of material fact exists where 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Id. (*quoting Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). "In determining 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law,' this [c]ourt must view all of the evidence and draw all reasonable inferences in the light most favorable to the non-moving party." Id. (quoting *Anderson,* 477 U.S. at 251–52). Moreover, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

DISCUSSION

  Defendant's argument is without tenable legal merit. Defendant does not contest any of the 36 statement of facts whatsoever. But rather panders that Plaintiff did not personally witness Charles Williams speak to his IME Surgeon. That's basically what Defendant rests his hat on. Rule 56(a) provides the requirements for summary judgement which Defendants clearly do not meet. It is clear that Defendants knew Plaintiff had not been adequately medically tested for his rotator cuff injury to then authorize any surgery involving removal of bone and ligament, and not repair the rotator cuff. That is clearly willful disregard of an injury

resulting. By the clear absence of required medical testing proves that Williams knew an injury was going to occur when authorizing an acromioplasty. To which Plaintiff would only authorize an arthroscopic repair. To which Plaintiff was well aware of the narrowing of the subacromial space and would not authorize an open repair, because it was not medically warranted. ECF 37 PgID 203-204. Williams willfully ignored Plaintiff's right to an arthoscopic procedure which resulted in ongoing injury in disability.

First and foremost Plaintiff did speak to Williams on several occasions and to his IME Surgeon on more than one occasion, as of 1999.. What Williams does not comprehend is that Plaintiff did not have to personally witness the communication. Plaintiff both spoke to the IME Surgeon as to PCG and their offer of work. And Plaintiff personally spoke to Williams as to his involvement in Plaintiff's surgery. From the conversations with Williams and with hisIME Surgeon is able to say probably that Williams spoke to his IME Surgeon prior to surgery and knew what the surgeon saw. Plaintiff clearly stated that Williams admitted to being on top of this from day 1 in statement of facts. Williams did not deny that. Williams was aware there is a narrowing of the subacomial space, and that Williams then authorizes an acromiplasty. This is done without medical testing. So Williams knew that an injury was certain to occur right from the start, and willfully disregarded that knowledge.

25

Now since an acromioplasty by itself does not serve as an intentional tort, even though not authorized by Plaintiff, Plaintiff clearly stated that after the 2021 Ultrasound Plaintiff knew that Williams authorized three sutures in a healthy tendon. Therefore any assertions as to prior orders by Defendants in this matter, do not bar Plaintiff from presenting an action as per claim ECL 23 PgID 83. This medical evidence was otherwise not available at any time prior to 2021. By MCL 418.315 Defendants are responsible for providing the medical evidence in providing reasonable medical care. Williams stated in 1999 that PCG as corporate policy only provides the medical care and does not provide the diagnosis. The proof as to an intentional tort is rather straightforward. By Exhibit ECF 37 PgID 203-204 Surgical report

The bursa is not resected. There is no anchor. The Surgeon admits to placing three sutures in Plaintiff's tendon and performs a debridement. Plaintiff clearly is aware of this and this is what Williams authorized. Now the rotator cuff tear has always been the supraspinatus attachment to humeral head. Exhibit ECF 37 PgID 208 1998 MRI. 2021 Ultrasound. ECF 37 PgID 210 Williams does not dispute three sutures were placed in Plaintiff's left shoulder. But they were not placed in the rotator cuff. That is called deductive reasoning. That is not a personal observation. It is personal knowledge. This is the willful disregard for Plaintiff's right to have his rotator cuff repaired, in authorizing surgery to which Plaintiff refused to

authorize.

Plaintiff' life experiences, education, ect do play a part in personal knowledge. What Plaintiff saw and heard goes through a process of deduction. So one proof that Williams knew an injury was certain to occur and willfully disregarded that knowledge it is thus shown.

By the same statement of facts Williams knew that Plaintiff could not receive an open award, without the medical evidence such as a surgical video and bone and ligament, even though Plaintiff underwent surgery with an IME. An IME does not provide medical care. That is not an IME's job. The Exhibit ECF 37 PgID 203-204 demonstrates that the surgeon performed an acromioplasty to get a good look. The 2021 Ultrasound and corresponding in 2022 letter ECF demonstrate that the three sutures by 1998 surgery are not in Plaintiff's rotator cuff tear as repaired but are in a tendon. That is proof number 2. By withholding the diagnosis Plaintiff was certain to be placed under MCL 418.301(5) as a refusal of work. PCG did not appear and testify. Plaintiff testified he was not offered work. ECF 44 PgID 284 Clearly this is willful disregard as to financial and physical injury after surgery. At no time in 22 years does Williams tell the Magistrate or the former WCAC now MCAC, that Plaintiff's injury was not repaired and Plaintiff has further damage to his rotator cuff that cannot resolve without his acromion and ligament. Plaintiff still cannot receive reasonable medical care until Williams states what he saw to do

so. And financially Plaintiff has not received even three weeks of work based on

Charles Williams deliberate actions being willful and knowing an injury was

certain to occur in not receiving either wage loss benefits or further medical care.

Williams knew that Plaintiff filed for re instatement of wage loss benefits in

2005, and that Williams had asserted privilege in withholding Plaintiff's what the

surgeon saw and did in surgery. The Employer without providing Plaintiff his

medical evidence as to what the Surgeon saw and did then admitted being an MCL

418.222 violation that Plaintiff had proved his injury to be a rotator cuff tear.

Plaintiff only proved by Magistrates order in 2000 that he received rotator cuff

surgery. Exhibit F attached. An acromioplasty is rotator cuff surgery. So as an

intentional tort, Plaintiff at this point can further allege that Williams is concealing

further rotator cuff damage. The result was the Magistrate closing award in setting

the bar as to when Plaintiff would be considered physically able to compete with

an able bodied person, but not performing the required testing to do so. Williams in

fact did commit three intentional torts, by Plaintiff's statement of fact to which are

not being contested by Williams or PCG.

Absent the 2021 Ultrasound and letter in 2022 to which Williams asserted

privilege after surgery, and did not provide Plaintiff surgical video, or bone and

ligament, in 1998, being willful resulted in the Magistrate relitigating Plaintiff's

medical previously litigated in 2000, to which injury was not stated, to resolving an

28

acromioplasty and surgery in 2005, Exhibit F attached. Absent said medical evidence discovered in 2021, and made probable by letter in 2022. Williams knew that an injury was certain to occur in that Plaintiff could not receive his reasonable medical care authorized in 2000 by order, until he could show what the injury was that he was to receive medical for. Clearly Williams knew by withholding said medical evidence and forcing Plaintiff to further hearing absent producing said medical evidence to then open award, resulted in a further injury in Plaintiff's rotator cuff tear being a worsening condition in impingement. Williams obviously willfully disregarded the fact that Plaintiff proved his injury in 2000, exhibit F and willfully disregarded his duty to tell the Magistrate and now MCAC that Plaintiff suffers permanent disability because Williams was contesting the injury and would not allow repair, or diagnosis.

Even though Plaintiff is justly entitled to a summary judgement at this point, the resulting damages probably exceed the 12% per annum authorized by law.

SUMMARY

1. Williams and PCG pierced their Corporate veil to authorize surgery without obtaining permission from Plaintiff to do so, in violation of Indiana Code.

2. Williams knew an injury was certain to occur because Plaintiff would not authorize an acromioplasty. There simply was no medical evidence warranting said procedure. Williams authorized said surgery to preclude Plaintiff from receiving a

rotator cuff repair as well as preclude Plaintiff from receiving his diagnosis as to "tender over the coracoid." Williams knew that Plaintiff could not prove an ongoing injury resulting in disability, after Williams asserted privilege as to what Williams IME surgeon saw in 1999., after Williams without any authorization from Plaintiff authorized an acromioplasty, in 1998, to contest the injury as fortuitous.

3. Williams believed that Plaintiff would depose the IME surgeon in order to receive the Surgeon's medical findings in surgery, and that the surgeon would then opine as to a non work related causation. Or that Plaintiff would be able to move his left shoulder well enough after surgery to not be found still disabled.

4. This is the reason Williams authorized surgery in 1998, knowing an injury was certain to occur, because Williams was not going to authorize a repair. Williams knew that insufficient testing had been performed and that neither Williams nor PCG was a representative as required by law. Williams simply disregarded that knowledge in the belief that Plaintiff would be forced to depose his IME surgeon in order to obtain medical finding in a Michigan Worker's Disability Compensation action. Williams ultimately believed that his IME surgeon would state a non work related causation, or fortuitous, in being deposed and admitting that the rotator cuff was not repaired.

30

CONCLUSION

1. Neither Charles Williams nor PCG are entitled to summary judgement as a genuine question of material fact exists as to Charles Williams intent to injury and wilfully disregarding said knowledge.

2/ Plaintiff Jose F. Olivares is justly entitled to summary judgement as no question of material fact exists as to Charles Williams and PCG's intent to injure Plaintiff and knowledge that an injury was certain to occur, by not authorizing a repair in 1998, asserting privilege precluding Plaintiff from knowing his medical condition as an ongoing injury resulting in disability. And resulting in further injury in both 2000 and 2005, in not being able to show his medical condition as permanently disabling, in 2000, resulting in being placed under a suspension of wage loss benefits to which the Magistrate then closed award as to surgery. And not ministerially obtaining wage loss benefits in 2005, allowing the Magistrate to set the bar to ability as repairing the rotator cuff tear along with acromiplasty in the Magistrate resolving acromioplasty and surgery. Said actions by Williams and PCG resulted in Plaintiff not receiving reasonable medical care, being left with a permanent impairment by Williams and PCG not allowing repair, as well as wage loss as of May 5th 1998, in Williams not reporting Plaintiff's medical condition after 2000 order, placing Plaintiff under MCL 418.301(5), which presumes injury arising out of and in the course of employments, and further ordered "still

disabled." In Williams and PCG willfully disregarding said knowledge and duty

owed to Plaintiff.

Respectfully submitted

/s Jose F. Olivares, in pro se litigant                           January 15th 2023
2581 International Dr. 1220C                                               Dated
Ypsilanti, MI. 48197

## CERTIFICATE OF COMPLIANCE

   I, Jose F. Olivares, certify that a true and correct copy of this pleading has been
sent to all interested parties through Counsel Phillip A. Costello, mailing address
111 S Macomb St, Monroe, MI 48161, has been sent by regular mail, postage
fully prepaid on this the 15th day of January 2023

Certified by

/s Jose F. Olivares
January 15th 2023

32

EXHIBIT C

## AFFIDAVIT OF JOSE F. OLIVARES

  I, Jose F. Olivares, verify and affirm that all the statements contained herein are true and correct based upon information, personal knowledge and belief. And if called as a witness would testify competently to the following.

1.  I had multiple communications with Charles Williams as well as his IME Surgeon as of June 21st 1998.

2. I never received diagnosis for the emergency room report as "tender over the coracoid. I believe that anatomically it is the coracohumeral ligament that is further damaged.

3. I still have ongoing back pain to the left shoulder as well as neck pain. I cannot move my left shoulder well. I do not believe I can compete with an able bodied person in my present medical condition.

4. At no time has Charles Williams with PCG offered me any employment whatsoever, even though I went to a Lansing job site as stated by letter under PCG masthead to be offered work. I was equitably paid for two weeks and PCG never appeared on said jobsite. I testified in 2000 that I was never offered work and neither PCG nor PAS appeared and testified that they had offered me work.

5. Charles Williams testified in 1999, that he was on top of this case from day 1. Williams further testified that he had authorized said surgery. Williams admitted that PCG policy is to treat the injury and not provide a diagnosis. Williams asserted privilege as to what his IME Surgeon saw in surgery as Plaintiff's medical condition. This testimony occurred in Kosciusko County Indiana, before the Honorable Rex Reed.

6. The Michigan Court of Appeals in 2005, affirmed the lower Court's granting full faith and credit to the 1999 Indiana Preliminary injunction. To which said Appeal stated that PCG took it's adequate remedy in relief and that the preliminary injunction was the final order of the Court.

7. I filed an application for superintending control as to the MCAC in 2015 which was then declared vexatious. PCG was not a party and neither was Charles Williams.

34

8. The Indiana order is based on limitations as to Charles Williams IME. There is no derivative MCL 418.131 action to be taken against said employee of PCG, and Williams.

9. There exists a genuine issue of fact, to which the Court previously ruled as to the law as to MCL 418.131, allowing Plaintiff to proceed to discovery. Neither PCG nor Williams has answered Plaintiff's timely interrogatories to date.

Affiant further sayeth not.

s/ Joes F. Olivares, in pro se                      January 15th 2023
2581 International Dr. 1220C                              Dated
Ypsilanti MI 48197

<u>CERTIFICATE OF COMPLIANCE</u>

   I, Jose F. Olivares, certify that a true and correct copy of this pleading has been sent to all interested parties through Counsel Phillip A. Costello, mailing address 111 S Macomb St, Monroe, MI 48161, has been sent by regular mail, postage fully prepaid on this the 15th day of January 2023

Certified by

/s Jose F. Olivares
January 15th 2023

EXHIBIT D