UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOSE F. OLIVARES,

                Plaintiff,             Civil Action No. 22-10574

v.                                          Matthew F. Leitman
                                             United States District Judge

PERFORMANCE CONTRACTING       David R. Grand
GROUP, *et al.*,                               United States Magistrate Judge

                Defendants.
_____/

**REPORT AND RECOMMENDATION TO GRANT
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF No. 46)**

This case appears to be one of many filed in this Court by *pro se* plaintiff Jose F. Olivares ("Olivares") related to a workplace injury he suffered in May 1998.[1] In general, under Michigan's Workers' Disability Compensation Act of 1969 ("WDCA" or the "Act"), M.C.L. § 418.101, et seq., Olivares' exclusive remedy for that injury was to apply for workers' compensation benefits. He did so, and on December 13, 2000, the Michigan Bureau of Workers' Disability Compensation (the "Bureau") found that Olivares was entitled to wage-loss benefits, but only until August 1, 1998, when he "unreasonably refused favored work" and "voluntarily removed himself from the work force." (ECF No. 50, PageID.429-37). On June 15, 2005, the Bureau awarded Olivares an additional "closed period" of workers' compensation benefits, but only for the period September 1, 2003 to

---

[1] The case was referred to the undersigned for all pretrial matters pursuant to 28 U.S.C. § 636(b). (ECF No. 6).

May 20, 2005, and only because his employer failed to establish a continuing offer of favored employment during that period. (*Id.*, PageID.416-27). Indeed, it was determined at the time that Olivares "failed to establish that his ongoing shoulder problems [were] related to the May 5, 1998 [workplace] injury . . ." (*Id.*, PageID.426).

Over the last few years, Olivares has filed numerous cases in this Court attempting to obtain additional compensation for his injury. In the instant case, Olivares attempts to do so by invoking the WDCA's "intentional tort" exception to the Act's exclusive remedy rule against his former employer, defendant Performance Contracting Group ("PCG") and its General Counsel, Charles Williams ("Williams") (collectively, "Defendants"). To invoke that exception, however, Olivares must show that he was "injured as a result of a deliberate act of the employer and the employer specifically intended an injury." M.C.L. § 418.131. Under the statute, the employer is only deemed to have intended to injure the employee "if [it] had actual knowledge that an injury was certain to occur and willfully disregarded that knowledge." *Id.*

Olivares' numerous filings in this case are difficult to comprehend, but his central claim seems to concern the alleged wrongful placement of three sutures during a surgical procedure on June 22, 1998, that he claims Williams authorized a surgeon to perform following his workplace injury. (ECF No. 23). The case proceeded through discovery,[2] and on January 13, 2023, Defendants moved for summary judgment, arguing that Olivares'

---

[2] Discovery closed in this case on December 1, 2022. (ECF No. 35). Olivares filed a motion to compel on December 27, 2022, but that motion was denied as it was both untimely and lacking in merit. (ECF No. 53). At any rate, as discussed herein, the salient facts necessary to resolve Defendants' instant motion are not in dispute.

2

action is barred under the WDCA's exclusive remedy provision, because his claim fails to satisfy the Act's intentional-tort exception. (ECF No. 46). On January 17, 2023, Olivares filed his response. (ECF No. 50).[3]

I.  **RECOMMENDATION**

For the reasons set forth below, **IT IS RECOMMENDED** that Defendants' Motion for Summary Judgment **(ECF No. 46)** be **GRANTED.**

II. **REPORT**

   A.  **Background**

      1. *Complaint*

On May 10, 2022, Olivares filed his verified Amended Complaint in this case based on diversity jurisdiction, raising one intentional tort claim pursuant to M.C.L. § 418.131 against Defendants. (ECF No. 23). While the complaint is difficult to decipher, upon thorough review, the Court liberally construes Olivares' allegations against Defendants as follows.

Olivares alleges that, on May 5, 1998, he was working for PCG when he suffered a fall that "ruptured" his "articular disk in the AC joint" of his "left shoulder." (*Id.*, PageID.83-84). Olivares further alleges that after a MRI revealed "narrowing of the subacromial space," defendant Williams "authorized emergency surgery" on June 22, 1998

---

[3] Although Olivares' filing (ECF No. 50) is entitled a "Motion and Brief for Summary Judgment and Rebuttal to Defendant's Motion for Summary Judg[]ment," the Court construes it as a response to Defendants' motion (ECF No. 46). Moreover, the docket reflects that Olivares' filing in ECF No. 47 is an incomplete but otherwise identical version of the corrected response he filed in ECF No. 50.

3

(the "June 1998 Surgery"). (*Id.*, PageID.92-94). Although Olivares claims that Defendants committed an intentional tort against him by merely authorizing the June 1998 Surgery, it is unclear exactly why Olivares contends doing so constitutes an intentional tort.

For instance, in certain parts of his complaint, Olivares faults Williams for authorizing *only* an "acromioplasty," even though Williams allegedly knew Olivares needed a "decompression [which] requires *both* an acromioplasty as well as a resectioning of bursa." (*Id.*, PageID.92-94) (emphasis added). Elsewhere, however, Olivares primarily appears to claim that Williams "called" and "advised" the surgeon "not to perform a [rotator cuff] repair [at all], but instead place three sutures in a healthy tendon and represent that it was a rotator cuff tear repaired." (*Id.*, PageID.84). Either way, Olivares alleges that Williams authorized the surgery for a fraudulent purpose "because [Williams] receives a bonus when an injured worker does not receive compensation" and "wanted to show that [Olivares] could return to normal work when an acromioplasty removed bone and ligament, removing aggravation to the tendon and muscle, as a fortuitous event, and not compensable." (*Id.*, PageID.91). As a result, Olivares alleges that he ended up "not receiving a rotator cuff repair" on June 22, 1998, as he required, which prevented him from being "able to compete with an abled bodied person had a repair been effectuated at surgery." (*Id.*, PageID.84-85).

Olivares' allegations fast-forward more than 20 years. Now he contends that, in 2021, he received an ultrasound as part of "a routine medical visit with the V.A. physician," which revealed that he had a torn rotator cuff in his left shoulder, and that "[u]pon examination [he] discover[ed] that the three sutures placed in healthy tendon in 1998 has

4

resulted in a rotator cuff tear." (*Id.*, PageID.88).

2. *Summary Judgment Evidence*

Primarily at issue in this case is Olivares' contention that Williams committed an intentional tort against him by *authorizing* the June 1998 Surgery. A review of the record evidence, including medical documents and magistrate decisions from Bureau hearings on Olivares' entitlement to wage-loss benefits, provides details of the June 1998 Surgery, as well as the events leading up to and following that procedure.

Olivares worked for PCG as an asbestos "abatement worker." (ECF No. 36, PageID.186). On May 5, 1998, Olivares fell off a ladder while on the job and was taken to the Emergency Department ("ED"), during which an examination found that he had "pain with external rotation" in his left shoulder, but an x-ray indicated that his "left shoulder series shows the clavicle to be intact distally," "well located," and "otherwise negative for acute soft tissue changes." (*Id.*, PageID.187; ECF No. 37, PageID.200). The ED doctor diagnosed Olivares with "[left] shoulder pain secondary to fall" and determined that he "is to follow up with his primary care physician if the symptoms have not completely cleared in five days. Until then he is to do no lifting or work with his left arm." (ECF No. 36, PageID.201).

Despite the doctor's orders, Olivares apparently "continued working [until] his employer requested [] that he get a release from a family physician because of the shoulder injury." (*Id.*, PageID.187). "When [Olivares] went to his family physician, he was referred to Dr. Thomas Graber," an orthopedic surgeon. (*Id.*).

On June 3, 1998, Dr. Graber saw and examined Olivares, noting that:

5

> [Olivares] was seen in the ER and x-rays were taken, which the patient states were normal. His main complaint is that he cannot raise his arm up. He says that the left arm was normal prior to this injury. Physical examination reveals that passively the shoulder moves up fairly easily, although the higher we lift it the more pain he has. Actively he has abduction only to about 75 degrees. He is able to get his left hand around behind his back and external rotation is normal. There is no palpable crepitation with motion. I suspect he has sustained an injury to his rotator cuff and I would recommend he undergo MRI scan for further evaluation.

(ECF No. 37, PageID.202).

On June 16, 1998, Dr. Graber ordered a "MRI of [Olivares'] Left Shoulder," which indicated that "[t]here appears to be a complete tear of the supraspinatus tendon" and "degenerative changes of the A-C joint with mild impingement," but otherwise "[n]o other abnormalities" or "muscular retraction." (ECF No. 37, PageID.208).

On June 22, 1998, Dr. Graber performed surgery on Olivares to repair his "Torn rotator cuff, left shoulder." (ECF No. 37, PageID.203). A surgical report documents the operation as follows:

> . . . A straight longitudinal skin incision was [] made over the anterior edge of the acromion and carried out over the deltoid muscle. This was carried through the subcutaneous tissue down to the anterior-superior aspect of the shoulder. An incision was made through the periosteum on the acromion extending from proximal to distal and subperiosteal dissection was carried out, including the attachment of the deltoid tendon into the acromion along its anterior edge. This incision was carried out into the deltoid muscle distally in line with its fibers. An oscillating saw was used to remove the anterior, lateral, inferior aspects of the acromion along with the attachment of the coracoacromial ligament. ***This gave good exposure to the rotator cuff. A 2 cm avulsion was found in the supraspinatus tendon at the attachment of the tendon to the greater tuberosity.*** Minimal retraction was present. A bit of the articular cartilage of the shoulder joint could be seen and the long head of the biceps was identified and appeared to be in good condition. The anatomical attachment of the supraspinatus tendon was

6

> debrided down to cancellous bone.  ***The torn tendon was repaired with three interrupted #2 Mersilene sutures, placing the sutures through the bone where it had been debrided and brought out more distally on the greater tuberosity.  An excellent repair was obtained in this fashion.***  It was reinforced with interrupted #1 Vicryl sutures.  The undersurface of the acromion, where the bone had been osteotomized, was then smoothed off using a bone rasp and then a bone rongeur.
>
> The wound was thoroughly irrigated with saline.  The deltoid muscle was then reattached to the remaining acromion with interrupted #2 Mersilene sutures placed through the bone.  The extension of the incision out into the deltoid was repaired with interrupted #1 Vicryl suture.  Subcutaneous tissue was closed with interrupted 2-0 Vicryl sutures and the skin was closed with skin staples.  Sterile dressings were applied.  An arm sling was applied.  The patient was taken to the recovery room in satisfactory condition.

(*Id.*, PageID.203-04).

A few weeks after the surgery and the "removal of the staples in his left shoulder," Olivares received a notice of employment from PCG, stating that they "received information from [his] treating physician . . . that [he has] been released to temporary, light-duty work" starting on "7-14-98" at "Board of Water & Light Ottawa, Lansing, Michigan," where his duties would include "[m]aintaining of de-con units," "[i]ssuing of small tools to workers," and "[j]ob site housekeeping."  (ECF No. 36, PageID.187; ECF No. 37, PageID.195).  Olivares "apparently failed to return to work after working two weeks" because "he was unable to drive to the job from his home . . ."  (*Id.*, PageID.187-88).

On November 29, 2000, Olivares had a trial before Magistrate L'Mell Smith of the Bureau, seeking wage-loss benefits based on his left shoulder injury.  (ECF No. 36, PageID.185-92).  At the trial, Dr. Charles Syrjamaki, M.D., testified that, during his exam of Olivares on July 27, 2000, he noted that:

7

> [Olivares] has decreased range of motion of the left shoulder with difficulty of abduction and anterior flexion. ***Whether this patient had a re-tear of the supraspinatus tendon during the time of physical therapy is certainly possible.*** An MRI scan of the shoulder would answer this question. . . . Although it is possible that he had a re-tear on the supraspinatus tendon, there is some evidence that he is using both arms with the numerous scratches and abrasions noted on his arm . . .

(*Id.*, PageID.190-91) (emphasis added). Dr. Syrjamaki then "ordered an MRI to determine whether or not there had been a re-tear in [Olivares'] rotator cuff ***but the MRI only revealed degenerative change in that area***." (*Id.*, PageID.191) (emphasis added). After reviewing the medical evidence and trial testimonies, on December 13, 2000, Magistrate Smith ruled that Olivares was "entitled to workers compensation benefits from the date of his injury, May 5, 1998 until August 1, 1998 when he voluntarily refused to continue to perform favored work" that was available to him, and therefore "voluntarily removed himself from the workforce." (ECF No. 50, PageID.429-37).

Several years later, in September 2004, Olivares filed another application for hearing before the Bureau, and a trial was held in 2005 before Magistrate Christopher Ambrose. (ECF No. 36, PageID.173-82). In pertinent part, the trial evidence included deposition testimony from two doctors. First, Dr. Kathleen Buran, M.D., testified that she reviewed Olivares' history, examined him in March 2005, found that he had "decreased range of motion" in his left shoulder, "tenderness to palpation of the AC joint," and a "weak rotator cuff on stressing, [] as well [as] discomfort in that area," and diagnosed him with "left internal derangement." (*Id.*, PageID.174-75). When asked at trial "what the normal course of recovery is for individuals having the similar type of surgery [Olivares] had," Dr. Buran testified:

8

> Maybe I can answer that this way: The MRI finding of a tear of the supraspinatus tendon and the impingement of the A.C. joint, and treatment of that is generally to do a decompression, which released the ligament, remove the spurring off the acromion, check out the A.C. joint to see if there's any impingement by that, and then also repair the rotator cuff. Not all the time, but most of the time, once this is taken care of, most people do – can return to their level of occupation . . . [M]ost of the time people do quite well to go back to their occupation. ***So to say by doing that type of surgery, at least in my expertise, I find that by relieving the source of pain or discomfort and fixing what the problem is, most people go back doing what they want to do and aren't considered disabled.***

(*Id.*, PageID.180) (emphasis added). Finally, Dr. Buran testified that "the findings she made in [Olivares'] AC joint were degenerative changes," though she could not "state within a reasonable degree of medical certainty that those degenerative findings relate back to [Olivares'] fall in 1998." (*Id.*, PageID.175, 180-81).

Second, Dr. James Wessinger, M.D., testified that he evaluated Olivares in May 2005, and reviewed both of Olivares' MRIs from 1998 and 2000. (*Id.*, PageID.175). Dr. Wessinger concluded that Olivares "did sustain a rotator cuff tear when he fell from a ladder in May of 1998," but that the MRI from 2000 "showed an intact rotator cuff" and that "prior examinations of the left shoulder post-operatively showed good motion." (*Id.*, PageID.175-76).

On June 15, 2005, Magistrate Ambrose issued an opinion awarding Olivares an additional "closed period" of workers' compensation benefits, but only for the period September 1, 2003 to May 20, 2005, and only because his employer failed to establish a continuing offer of favored employment during that period. (ECF No. 50, PageID.416-27). Indeed, it was determined at the time that Olivares "failed to establish that his ongoing

9

shoulder problems are related to the May 5, 1998 [workplace] injury," and "since [his] ongoing problems are degenerative in nature . . . [he] is only entitled to medical care and treatment which is directly related to the rotator cuff tear that he suffered in May 1998." (*Id.*, PageID.426).

Over 15 years later, on August 26, 2021, Olivares was experiencing "limited" range of motion in his left shoulder, and underwent an ultrasound, which revealed that:

> [t]he biceps tendon is intact and lies in the bicipital groove. The subscapularis tendon is within normal limits. **Supraspinatus tendon shows a 1.7 cm wide mid and anterior focal full-thickness tear.** The infraspinatus tendon is intact. Mild to moderate fatty infiltration/atrophy of the supraspinatus muscle. No fatty infiltration/atrophy of the infraspinatus muscle. Dynamic imaging suggests minimal impingement.

(ECF No. 37, PageID.210) (emphasis added).

The record also includes a December 30, 2022 letter from Olivares' primary care physician, Dr. Aaron Sal Parzuchowski, in which he asserts that Olivares "has chronic left shoulder pain and a supraspinatus tear that is likely related to his L shoulder injury in 1998, for which surgery was performed." (ECF No. 44, PageID.284). However, Dr. Parzuchowski noted that he was "not qualified to comment further on the indication for and quality of[] his 1998 surgery." (*Id.*).

Finally, Defendants provided an affidavit from defendant Williams, PCG's General Counsel, in which he attests that he never instructed Dr. Graber "to place three sutures in said otherwise healthy tendon" and "did not in any other way injure Mr. Olivares." (ECF No. 46, PageID.302). On the other hand, Olivares asserts in his own affidavit that "PCG never intended that [he] receive a rotator cuff repair in authorizing said June 21st 1998

10

surgery," and that Williams instead instructed Dr. Graber to "place[] three sutures in a healthy tendon" to be falsely represented "as a rotator cuff repair." (ECF No. 36, PageID.163-64). Olivares asserts that "[t]he 2021 Ultra[s]ound is proof that PCG intended that [he] be injured, by placing three sutures in his tendon resulting in infiltration of fatty deposits into the sutures as well as atrophy of the supraspinatus. . . . [T]he 2021 Ultra[s]ound verifies that there was no repair." (*Id.*, PageID.164).

Defendants now move for summary judgment on Olivares' intentional tort claim against them, arguing that his claim does not fall within the intentional-tort exception to the WDCA's exclusive remedy provision.

B.     **Standard of Review**

Pursuant to Federal Rule of Civil Procedure 56, the Court will grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Pittman v. Cuyahoga Cnty. Dep't of Children & Family Servs.*, 640 F.3d 716, 723 (6th Cir. 2011). A fact is material if it might affect the outcome of the case under governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material fact exists, the Court assumes the truth of the non-moving party's evidence and construes all reasonable inferences from that evidence in the light most favorable to the non-moving party. *See Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006).

The party seeking summary judgment bears the initial burden of informing the Court of the basis for its motion and must identify particular portions of the record that

11

demonstrate the absence of a genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009). "Once the moving party satisfies its burden, 'the burden shifts to the nonmoving party to set forth specific facts showing a triable issue.'" *Wrench LLC v. Taco Bell Corp.*, 256 F.3d 446, 453 (6th Cir. 2001) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). In response to a summary judgment motion, the opposing party may not rest on its pleadings, nor "'rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact' but must make an affirmative showing with proper evidence in order to defeat the motion." *Alexander*, 576 F.3d at 558 (internal quotations omitted).

### C.     Analysis[4]

In seeking summary judgment, Defendants argue that Olivares' claim does not fall within the intentional-tort exception to the WDCA's exclusive remedy provision because his claim is merely based on "wild speculations" and "not made of personal, first-hand knowledge" of facts that establish Defendants "*specifically intended* an injury that was

---

[4] Defendants' argument that this Court "lacks jurisdiction to hear [Olivares'] work-related injury claims, as '[t]he right to recovery of benefits as provided in this act shall be the employee's exclusive remedy against the employer for a personal injury or occupational disease' MCL 418.131(1)" (ECF No. 46, PageID.294-95), is without merit. Olivares alleges that he is a citizen of Michigan, and Defendants are citizens of Kansas, and that the amount in controversy exceeds $75,000. Accordingly, he satisfied the elements of this Court's diversity jurisdiction. 28 U.S.C. § 1332. Moreover, since the Court could not determine whether the WDCA's intentional tort exception applies without examining the matter on its merits, it would make no sense to say the Court lacks subject matter jurisdiction over the claim. *See e.g., Pearce v. Werner Enterprises, Inc.*, 116 F. Supp. 3d 948, 953 (D. Neb. 2015) ("Even if [plaintiff's] claims are ultimately determined to fall under the exclusive provisions of the [Nebraska Workers' Compensation] Act, that will not affect this Court's subject matter jurisdiction.") (citing *Cincinnati Indem. Co. v. A & K Const. Co.*, 542 F.3d 623, 624 (8th Cir. 2008)).

12

*certain to occur*." (ECF No. 46, PageID.296) (emphasis in original).[5]

M.C.L. § 418.301(1) provides that "[a]n employee, who receives a personal injury arising out of and in the course of employment by an employer who is subject to this act at the time of the injury, shall be paid compensation as provided in [the WDCA]." While this statute promises compensation for covered employees who are injured on the job, in general, it also constitutes such an employee's *exclusive* remedy. Indeed, subsection 131(1) of the WDCA expressly provides, "[t]he right to the recovery of benefits as provided in this act shall be the employee's exclusive remedy against the employer for a personal injury or occupational disease." M.C.L. § 418.131(1). This *quid pro quo* is by design; as the Michigan Court of Appeals has explained, under the WDCA, employees are provided nearly automatic compensation for injuries sustained on the job without regard to who is at fault for the injuries, while in exchange employees are limited to benefits payable under the WDCA as their exclusive remedy for such injuries and may not generally bring a tort action against their employers. *Sanchez v. Eagle Alloy, Inc*, 254 Mich. App 651, 659 (2003) (citing M.C.L. §§ 418.301(1), 418.131). "The one exception to this recovery scheme is when an employer commits an intentional tort." *Travis v. Dreis and Krump Mfg. Co.*, 453 Mich. 149, 551 NW 2d 132 (1996). But the WDCA employs a very narrow and

---

[5] Defendants alternatively argue that Olivares' "present lawsuit is barred by an Order of the Michigan Court of Appeals" dated October 7, 2015, which sanctioned Olivares for filing a vexatious complaint, directed him to pay defendant actual damages and expenses, and ordered that "[t]he Court shall accept no new appeals or original actions from plaintiff until these items are paid." (ECF No. 46, PageID.323). Because the Court recommends granting summary judgment for Defendants based on Olivares' failure to meet the intentional-tort exception of the WDCA's exclusive remedy provision, it declines to address this argument. The Court notes, however, that Defendants cite no authority for the proposition that a state court order prohibiting Olivares from filing certain papers *in that court* prohibits him from commencing an action *in this federal court*.

13

circumscribed definition of "intentional tort." Subsection 131(1) of the WDCA states, in pertinent part:

> . . . The only exception to this exclusive remedy is an intentional tort. ***An intentional tort shall exist only when*** an employee is injured as a result of ***a deliberate act of the employer*** and ***the employer specifically intended an injury***. An employer shall be deemed to have intended to injure if the ***employer had actual knowledge*** that an ***injury was certain to occur*** and ***willfully disregarded that knowledge***. The issue of whether an act was an intentional tort shall be a question of law for the court. This subsection shall not enlarge or reduce rights under law.

M.C.L. § 418.131(1) (emphasis added).

The Sixth Circuit has also made clear that "[t]he standard for establishing that an injury is 'certain to occur' is 'extremely high,' and requires the plaintiff to show that '*no doubt* exists with regard to whether [an injury] will occur,' *Travis*, 551 N.W.2d at 143 (emphasis added), and that the employer's knowledge encompasses the harm that indeed occurred. An employer's knowledge of general risks is insufficient to establish an intentional tort." *Hetterscheidt v. Aleris Specification Alloys, Inc.*, 687 F. App'x 462 (6th Cir. 2017); *see also Oaks v. Twin City Foods, Inc.,* 198 Mich.App. 296, 497 N.W.2d 196, 197 (1992) ("[I]t is not enough that the employer acted recklessly and even envisioned the type of accident that did in fact occur."). Viewed against these standards, even construing the evidence in the light most favorable to Olivares, he failed to raise a material question of fact that Defendants authorized the June 1998 Surgery with "actual knowledge" that an injury was "certain to occur."

It is important to clarify at the outset that Olivares brings this action for an intentional tort against Defendants primarily relying on an ultrasound he received in *August*

14

*2021* – more than 23 years after the June 1998 surgery – which revealed that his "[s]upraspinatus tendon shows a 1.7 cm wide mid and anterior focal full-thickness tear." (ECF No. 39, PageID.254; ECF No. 37, PageID.210). Liberally construed, Olivares apparently contends that the discovery of this rotator cuff injury in 2021 is proof that, in June 1998, Williams instructed Dr. Graber "not to perform a repair" but "instead place three sutures in a healthy tendon and [falsely] *represent* that it was a rotator cuff tear repaired." (ECF No. 23, PageID.84, 88, 90-91 (emphasis added); *see also, e.g.*, ECF No. 36, PageID.164 ("the 2021 Ultra[s]ound verifies that there was no repair"); ECF No. 44, PageID.281 ("The tear by 2021 Ultrasound previously submitted is consistent with the tear Plaintiff suffered on May 5th 1998, by Medical opinion thereof").[6] While unclear whether Olivares is asserting that his torn rotator cuff in 2021 was the same injury left unrepaired since May 1998, or a new injury caused by the June 1998 Surgery, a review of the record evidence simply belies the underlying basis for his intentional tort claim – *i.e.*, that Dr. Graber never repaired his *actual* torn rotator cuff and instead fraudulently placed three sutures in a *healthy tendon*.

---

[6] The Court notes there are many contradictions in Olivares' own accounts of the events at issue in this matter. As one example, in his prior "Motion as to Medical Reason Why Plaintiff's Supraspinatus Tendon Did Not Re Attach To Bone [] Intentional Tort MCL 418.131," he did not assert that defendant Williams instructed Dr. Graber to not perform an actual rotator cuff repair, but instead offered an entirely different explanation as to why the June 1998 Surgery was unsuccessful, *i.e.*, that PCG and Williams offered him work too early despite knowing he required at least 20 weeks to properly heal. (ECF No. 39, PageID.248-49) ("Williams knew that offering work less than 20 weeks after surgery . . . would result in the tendon not re attaching [sic] . . . To which Plaintiff was forced to wait 20 years to see the results of Williams wanton and willful offer of work prior to the 20 week period required for re attachment occur after the 1998 surgery . . .").

15

To the contrary, treatment records make clear that Dr. Graber applied three sutures to repair the "complete tear of the supraspinatus tendon" in Olivares' left rotator cuff, as detected in the MRI from June 16, 1998. (ECF No. 37, PageID.203, 208). Dr. Graber's surgical notes also document the procedure in detail, noting specifically that "[a] 2 cm avulsion was found in the supraspinatus tendon at the attachment of the tendon to the greater tuberosity," and that "[a]n excellent repair was obtained" on Olivares' "torn tendon" via application of "three interrupted #2 Mersilene sutures, placing the sutures through the bone where it had been debrided and brought out more distally on the greater tuberosity." (*Id.*, PageID.203-04).

The fact that Olivares' torn rotator cuff was actually repaired during the June 1998 Surgery is also corroborated by the testimonies of three doctors who subsequently reviewed his medical history and detected no lingering or new rotator cuff tears upon their own independent exams. Specifically, during the 2000 hearing before Magistrate Smith, Dr. Syrjamaki testified that, in 2000, he examined Olivares and ordered another MRI of the left shoulder because it was possible that Olivares had a "***re-tear of the supraspinatus tendon*** during the time of physical therapy," but that "the MRI ***only revealed degenerative change in that area***." (ECF No. 36, PageID.190-91) (emphasis added). In other words, Dr. Syrjamaki opined that Olivares' shoulder issues could have been due to a *new* tear in his *previously repaired* rotator cuff before ruling out that possibility after an MRI confirmed only degenerative changes and no tears at all. (*Id.*, PageID.191).

Similarly, during the 2005 hearing before Magistrate Ambrose, in response to a question about "the normal course of recovery [] for individuals having ***the similar type of***

16

*surgery [Olivares] had [on June 22, 1998]*," Dr. Buran testified that "by doing that type of surgery, at least in my expertise, I find that by relieving the source of pain or discomfort and fixing what the problem is, *most people go back doing what they want to do and aren't considered disabled*." (ECF No. 36, PageID.180). Moreover, upon review of the "MRI reports from 1998 and 2000" and her own independent exam of Olivares, Dr. Buran did not detect any present tear in the rotator cuff but instead diagnosed him with "left internal derangement" and "degenerative changes in the A.C. joint." (*Id.*, PageID.174-75, 180-81). The same goes for Dr. Wessinger, who testified that Olivares "did sustain a rotator cuff tear when he fell from a ladder in May of 1998," but that his MRI in 2000 – two years after the June 1998 Surgery – "showed an *intact rotator cuff*" and that "prior examinations of the left shoulder *post-operatively showed good motion*." (*Id.*, PageID.175-76) (emphasis added).[7]

Finally, both the decisions of Magistrates Smith and Ambrose from the Bureau hearings similarly reflect that the rotator cuff tear Olivares sustained in May 1998 was not present in 2000 or 2005 after he received rotator cuff surgery on June 22, 1998. (*See, e.g.*, ECF No. 36, PageID.171, 1 (Magistrate Ambrose finding that "Dr. Buran also testified that the type of surgery that Mr. Olivares had in his left shoulder [on June 22, 1998] normally results in most people going back [to] 'doing what they want to do and aren't considered

---

[7] Defendants also submitted a 2021 decision from the Court of Appeals of Indiana, which notes that Olivares "filed a past claim for malpractice with the [Indiana Department of Insurance] on April 14, 2000, alleging malpractice against Dr. [Graber] and others related to the same care [concerning the June 1998 Surgery] complained of his in current proposed complaint, and the medical review panel found no malpractice in an opinion dated January 14, 2002." (ECF No. 46, PageID.313-14).

17

disabled,'" and that Olivares "failed to establish that his ongoing shoulder problems are related to the May 5, 1998 injury"); *id.*, PageID.191 (Magistrate Smith finding that "[t]he records of Dr. Thomas Graber [] confirmed that he . . . performed surgery on [Olivares'] left rotator cuff on June 22, 1998," and that "Dr. Syrjamaki ordered an MRI [in 2000] to determine whether or not there had been a re-tear in [Olivares'] rotator cuff but the MRI only revealed degenerative changes in that area.").

The foregoing evidence easily demonstrates that the Defendants satisfied their summary judgment burden of showing the absence of a genuine dispute of material fact that Olivares underwent a necessary and successful rotator cuff surgical repair in June 1998, and that any "authorization" for such a surgery was not improper. *See Celotex*, 477 U.S. at 325; *Alexander*, 576 F.3d at 558. In response, Olivares could not simply rest on his pleadings, but rather, needed to provide "proper evidence" "showing a triable issue.'" *Wrench LLC,* 256 F.3d at 453; *Alexander*, 576 F.3d at 558. Olivares failed to meet this burden, as he offers nothing more than his unsupported and conclusory assertions (which also lack any foundation) that defendant Williams "authorized" the June 1998 Surgery, and that his doing so was somehow improper.[8]

In sum, Olivares' contention that the June 1998 Surgery was a scheme by Defendants to falsely "represent" a repaired rotator cuff by placing sutures in a *healthy*

---

[8] Olivares' reliance on the 2021 ultrasound as establishing that, over 20 years ago, Williams wrongfully authorized a fraudulent surgery lacks any foundation and is wholly speculative. While that ultrasound demonstrates the presence of a torn left rotator cuff in 2021, it does not at all speak to the timing or cause of that injury, much less that it is connected in any way to the June 1998 Surgery.

tendon instead of his actual *torn* tendon is belied by the record evidence demonstrating that he suffered a torn rotator cuff in May 1998 but did not have a torn rotator cuff when later examined in 2000 and 2005.  Olivares does not dispute the authenticity of these records, and as such, he failed to present evidence showing that the June 1998 Surgery was anything more than a necessary and successful left rotator cuff repair.  He did not present any cognizable evidence – Olivares' own conclusory assertion, which lacks any foundation whatsoever, is inadequate[9] – that Williams "authorized" the June 1998 Surgery, or that Defendants had "actual knowledge" that in doing so an injury was "certain to occur."  Accordingly, Olivares failed to satisfy the high threshold necessary to show that he suffered an injury falling within the WDCA's intentional-tort exception, and Defendants are entitled to summary judgment on his claim against them.

### III. CONCLUSION

For the reasons set forth above, **IT IS RECOMMENDED** that Defendants' Motion for Summary Judgment **(ECF No. 46)** be **GRANTED**.

Dated: February 7, 2023                     s/David R. Grand
Ann Arbor, Michigan                         DAVID R. GRAND
                                            United States Magistrate Judge

---

[9] Fed. R. Civ. P. 56(c)(4) provides, "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  Olivares presented no evidence whatsoever that he has personal knowledge regarding any alleged instruction by defendant Williams regarding the June 1998 Surgery, or that he is competent to testify as to the significance of any of the medical records in this case.

### NOTICE TO THE PARTIES REGARDING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir.1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir.1981). The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir.1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir.1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge. A party may respond to another party's objections within 14 days after being served with a copy. *See* Fed. R. Civ. P. 72(b)(2); 28 U.S.C. §636(b)(1). Any such response should be concise, and should address specifically, and in the same order raised, each issue presented in the objections.

### CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on February 7, 2023.

s/Eddrey O. Butts  
EDDREY O. BUTTS  
Case Manager